May it please the court, counsel, I'm Don McCleary and I represent James Scott Donzee, the appellant in this case. At first glance this case looks like a divorce case, but I had a eureka moment as I was driving down here today, a long drive down the interstate from White, Illinois, and I went by miles and miles over central Illinois farmland. What this case really is, at basis, is a fight over farmland between two farmers and they just happen to be married each other, and that's what this case comes down to. They had two tracts of farmland, Tract 2, which they acquired in 1996, which had the family homestead, and Tract 1, which they acquired in 1998, both 80 acres, mixture of pasture and farmland on both of them, and they were both involved in farming operations from the beginning. And basically they both participated in running the farm and doing the work on the farm. This wasn't a type of marriage where you had wife just taking care of the kids and doing the hard work in the house. She was out there farming also. And it shows in this case, because what mattered to them both was the farmland. My client wanted all of the farmland, he wanted both tracts, and he was willing to pay for it. He accepted the valuation of the appraiser hired by his wife and was saying, show me, I'm ready to write out a check. She on the other hand, to hold on to Tract 2 and the family homestead, was willing to forego a huge amount of money to accomplish it. So the trial court, Judge Pacey, he did a solid. He basically said, we have two tracts here, Tract 2 for the wife, Tract 1 for the husband. On its face, it looks reasonable. When you dig down though, and when you look at it under 5503D, the key question is, was it just? We submit that it wasn't just. Look at it in regard to the parties as they came before the court. We have the wife, who was working throughout on the farm, but wasn't employed outside the home. My client, in addition to working on the farm, was employed outside the home earning $73,000 a year. We submit that what Judge Pacey did was basically to make Mrs. Donzie land rich, but cash poor. She received Tract 2, and this was all her proposal. The court basically accepted her proposal. She ended up with the land, Tract 2, plus $25,000 approximately in IRAs and $5,000 in her bank account. In other words, after a 25-year marriage, you got your land, that's what you wanted, but very little in the way of cash. If my client's proposal had been accepted, she wouldn't have received any land, but she would have received $568,000. She would have received it if my client's proposal was simply to purchase the land without paying any sort of capital gains tax, without auctioneer's fees, without real estate commission, with nothing. Basically right out of the check. Judge Pacey decided otherwise. We submit that when you look at it under 503d-5, the relevant economic circumstances of the parties, that simply was not a just result. Well, aren't you making the argument she should be making if she's unhappy? It's odd, Your Honor. It's an odd argument, but it isn't who's happy or who's unhappy. We submit that the court under 503d has to determine just proportions. Now, sometimes that coincides with what parties want, oftentimes we submit it doesn't coincide with what parties want. Right, but you're arguing it's unjust to her. I'm arguing that it's unjust to both parties. In regard to it being unjust to my client, we have the situation where because of what the trial court did, we have the parties having land adjacent to each other. And we submit there's going to be problems as a result of that. Some of the problems were brought up before the trial court. Now, we understand that the trial court actually did agree with us on that point. Because on paragraph three of the court's order of November 2nd, 2012, the trial court stated petitioner's proposals for division of marital assets, although having more potential for future disagreements, are more equitable under the evidence concerning the dissolution of the 25-year marriage. So Judge Pacey recognized that there's potential problems in regard to this. He decided that it was still more equitable to do it, but he recognized the problems. We submit that this is somewhat like the case of sales that we cite in our brief, in which this court reversed a division of property in which the wife had a 20% interest, I believe, in the husband's corporation, saying that that wasn't proper, that there were sufficient assets to avoid that problem in the future. Any possibility of problems in the future could have been avoided by simply giving my client the land and forcing him to write out a check. What problems do you anticipate? I mean, she's got her acreage, he's got his acreage. This has been farmed since they acquired both tracts as an economic unit. There was testimony about problems. My client getting in on his 80, accessed problems to the back 80. They discussed problems in regard to fencing, because on the 180, my client's father has run a cattle operation, so there's going to be fencing problems. There's going to be water problems between the two, keeping the drainage operating. Didn't his father testify he was going to retire and get out of the cattle business? Unfortunately, we don't have an adequate record in this case. We have the bystander's report. I think that at his age, I think the trial court did inquire about that, and he said that he would eventually retire. I don't think he put a date on it, though. In regard to this situation, we basically have, once again, land-rich, cash-poor in regard to Mrs. Donzie, and that gets to the second part of this whole case, permanent maintenance in regard to it. Once the court gave Mrs. Donzie what she wanted, he then turns around and gives a permanent maintenance award of $2,000 a month, one-third of the gross income of Mr. Donzie. We just don't believe that was necessary in this case. There were more than enough assets to obviate that necessity. Under 503D, we have number 10, whether the apportionment is in lieu or addition to maintenance. We believe that in this case, this is a classic type of case where there were enough assets so that Mrs. Donzie could have received enough in the way of cash to obviate the necessity perhaps of permanent maintenance, making it temporary maintenance, if there was going to be any maintenance, rehabilitative maintenance. Mrs. Donzie has a set skill, farming, which is of value in a rural county like Livingston. This isn't a situation where you have... She doesn't have a place to live. She hires out as a farmhand? Any sort of operation in regard to farming. What would her income, what would a realistic income be from that? Don't know. And the trial court didn't inquire in regard to that. Well the $500,000 isn't very much. $569,000. Well what do you draw down on that for your monthly expenses? It's a lot more than $25,000, your honor. Really? Yes. If that was her retirement income, how much would they suggest she take each year? 4%, maybe 5%. You've got a high school homemaker slash skilled farmer. By your own testimony. I guess I would have found that interesting to inquire into, but go ahead. In regard to the maintenance issue also, we have the fact that she never indicated any sort of disability. No, this isn't the testimony where she came into court and said, I can't earn a living. I just don't have any skills. The testimony was completely the contrary, and my client never disputed this. We never disputed that she was an integral element, an important element in running that farm. They were both farmers, as I said. In this case, though, the court did not inquire as to what she could earn in Livingston County as a result of her farming skills. It just wasn't done at all. We believe that it should have been done in regard, before the court especially entered a permanent maintenance award, before the court entered any sort of maintenance award. Did you ask her that? No, I did not. No, I did not. Candidly, I did not. We believe that it was clear from her own testimony, which we did indicate in my client's case, that she was an important part of the farming operation, and we supported her contention that she was a skilled farmer, because that's the simple truth of the case. In regard to the farmland, getting back to that for just a moment, I think the whole question about capital gains is important also. We're talking about land that was purchased back in the 90s. There's been a real run-up in regard to the value of farmland. In this case, she could have received the value without any sort of capital gains at all. She'd have to invest it, of course. We understand that. But we don't think this is a situation where the husband was trying to get off cheaply. He was willing to pay for what he wanted. And I'm not standing up here and saying he was doing it out of the goodness of his heart, but he wanted the farmland and he was willing to pay for it. Judge Pacey decided otherwise. I think what he, though, had to do, and what this court has to do, is look at it objectively. Was this just? And we think that just because one party says that it's just doesn't make it just. The court has to look at the whole issue, and we don't think that Judge Pacey did that in this case, at least not adequately enough. We'd ask that the court reverse and bring it back before Judge Pacey's retired now, before whichever judge would be hearing it, for determination as to the division of property all over again, and for a look at what sort of statement should be awarded in this case. Thank you, Your Honor. Thank you. Ms. O'Rourke. Good morning. And may it please the court, counsel. I did think it was a divorce case. I thought it driving down here, and I think it now, it's a divorce case. And I think it's pretty, I don't think it's complicated. I don't think that Judge Pacey made any sort of error, let alone reversible error. The problem is that, and while I appreciate that counsel is so concerned for my client, the testimony that he is ignoring is that she was very tied to this land. And that is what Judge Pacey heard. We have pictures, I was flipping through them, I believe exhibit 28 are a series of photos which show when they moved in. And I'm going to be honest, it was just a crappy old farmhouse. Then we had the after photo, after my client lived there, put her sweat equity into it, changed that farmhouse into a home. She showed pictures of little tiny trees, some of which she got for Mother's Day, that she put out on the farm. But then, the after photos, we have big gorgeous pines. She had pictures of where her dog was buried. She had pictures of where she had selected for her own burial. I don't even know if it's legal in the state of Illinois, but by golly, she testified she wanted to be buried on that farm. She was tied to that land. And that's what the testimony was. Now, I very much appreciate that he's saying, well, we would have just bought it. And with the shoe being on the other foot, let me put that on for a while. Let me put on and pretend I'm representing Mr. Doncey. Imagine if he didn't want that, what that would be like. You get all the property, but you have to go out and borrow over half a million dollars and give her half of your retirement. And you have to service this debt, in addition to trying to pay some maintenance on top of that. If that had been up here, that would have been reversible error. The issue really becomes, and Mr. Doncey, Sr., I know he's not a senior, but the older Mr. Doncey was asked by Judge Pacey, if we sell this, you're just coming in and buying it, aren't you? He said, yes, I am. And so I submit to you that this really isn't a case between Mr. and Mrs. Doncey, but the elder Mr. Doncey and my client, in terms of who were the winners and the one-upsmanship on that. But we had some question about him running his cattle. Again, he is a third party who is not a part of this case. There was no written lease with him. There was nothing with regard to him running his cattle. In fact, what they had done in the past is he would help them at times of harvest and at times of input in exchange for allowing them to have his cattle on his land. Nothing unusual about that. But at the same time, nothing written, nothing significant. And this property, you know, I mean, it's real estate, so it's been here since forever. But for the last, what, 12 years, it's been farmed together. Big deal. I mean, my client showed, here's the tracks, here's how you could do this. She took out a plot book and said, this farm was always accessible independently because for however many years that it had been planted, it had been used as a separate farm. And only in the last short period of time have they been farming it as a unit. She talked about the fact that all you had to do, and in fact, they had put up a fence to separate the two so that she could farm and he could farm. With regard to there being any potential problems, we haven't heard of any. There hasn't been any subsequent, anybody's rushed back to court in this case. No one's come back in terms of trying to say there's any sort of problem. And I realize that the court doesn't have that necessarily in the file, but I guess the idea that no one has returned to court over this issue and they've gone through now problems. It just, to me, I have a difficult time trying to argue it because it seems very obvious to me. They had two 80-acre tracks. My client wanted the one with her home and the farm property and agreed to give him his. Where did that originate, that home, that 80-acre track and that house there? That house had been there for a period of time and there is a deed, they purchased that from a third party. It was not a family home. It was not, it had been, you can see the deed in the, I don't know. And it was purchased during the marriage? It was purchased during the marriage. It was purchased from a third party. The Donsies had never owned that, the older Donsies had never owned that piece of property prior to the time the younger Donsies purchased it. So it wasn't some sort of track that had been in the family for a million years sort of, pardon me, for a period of time. I don't mean to be flippant on that, but as I approach this case it just seems very obvious. We have a set of assets, the judge divided those assets, he divided them equitably. I would also note that they were equal, but I mean equitably in considering what each party was requesting and considering the evidence in front of him. And when you talk about equity, I do think it's broader than just she got 50% and he got 50% and that's equitable, but rather what really defined her. And she was defined as a farmer, she was defined as being connected to that family home. To be honest with you, I as her attorney sat her down and said, Kathy, come on, let's just take this money and run, you can move into town in a nice condo. No, that's not what she wanted. That is not who she was. And everything in terms of who she believed in, when you're talking about equity, everything she understood herself to be had been destroyed by this marriage. Her children were split by this marriage, her own husband had left her, everything that she thought she had worked for all these years was gone. And what did she have left? But she did want the farm to help define who she was. And I don't see anything wrong with that, I really don't. I don't think there's anything wrong with Judge Pacey considering it. And even if we took all of the emotional component out of it and just said, here's a list of assets, divide up the assets, it was a very fair, equitable way to proceed. And to be honest with you, to force Mr. Donzie to go out and borrow money to pay her for her share of the assets, I think is not fair. The proposal though was then, well then sell it all. Well the then sell it all proposal is really kind of a ridiculous one that I think even they have abandoned at this point. But that would result in a lot of difficulties. And the idea that he then gets to, I mean, to think if we had done what they asked, I think I would be up here saying, he got 100% of the property, really? Do you think that's fair? I don't know that it is. And I don't think that this particular piece of property to my client is something that is fungible where you can simply say, here's the money, it's the same thing. Because I don't think it is. For her it was not. She defined herself by farming. She defined herself as a mother. She defined herself as a wife. And several of those things had been destroyed as a result of this divorce and she wanted to keep at least part of who she was as a human being. The second issue that they have raised is really the issue of maintenance. I think that this idea that that was in error is not appropriate. I cited the Kerber case, which of course, Justice Connect, you wrote, which basically talked about there being a classic case for maintenance. And in this case, you've got a 27-year marriage, she's never worked outside the home, all she's ever been is a farmer. She's 51 years old, she has a high school education, and the idea that she can rent herself out as a farmer, I don't know that that is really a very effective idea. And if you look at our exhibit, I believe it's exhibit 38, which we have highlighted everywhere that the elder Mr. Gonsi had farm property. I don't know how accepted she would have been in a farm community without, with the father-in-law managing this. And I know that that's nothing that is in the record, and I know maybe you can't consider that, but the bottom line is, you know, we are dealing with a very small community of very tight-knit people, and I don't think very many people would have said, hey, let's go hire your former daughter-in-law. I don't think sitting at the grain elevator or the local coffee shop, that would have gone over real well. I'm going to be honest. I don't think that the idea that she would be able to work in this area by being hired out to other people was necessarily anything that's, it seems like a good idea, but I don't know how practical a result that would have actually come into. Those questions, however, were not raised. They were never, no one asked her that. No one said, can you do this if you didn't have farmland, would you be able to farm for other people? No one asked her about her capacity to farm outside of farming her own property. Nobody asked her about, there was no expert that said if you have $500,000 and you invested that, what would your return be, and would that be enough to live on? If this, if the party, if the submission is that she would need to actually use that, I think this district has made it very clear that you don't have to use your property awarded to you to support yourself, that that should, where there are sufficient funds to pay maintenance. The maintenance amount in this case was reasonable under the circumstances. The court did consider the $73,000 wages plus some of the farm, because again, the farm was split. The farm income in the past had been $18,900, so I don't know if, if Pacey does not make a finding on, pardon me, I apologize, Judge Pacey did not make a finding on that, however, you know, I think that's a reasonable response in terms of, well she could probably receive about half of it and Mr. Donzie could receive about half of it in terms of the income. So with regard to that, I think the amount of maintenance is appropriate, the idea that it is permanent maintenance is also appropriate given the age of my client, given the length of the marriage. Again, this was, she was only 51, this was a 27 year marriage, so over half of her life had been involved in terms of this marriage creating this property. And in terms of creating this property, I want this court to think a little bit, I don't have it right in front of me, but one of these tracts of land was worth approximately $368, the other one, what's in the record, was more. One of them had like a $63,000 mortgage, the other had a $43,000 mortgage. These people purchased, this is an inherited land, this is something that during their marriage they worked, they created, they farmed, they paid down their mortgage, this is something that they created during their marriage and that was done by both of their hard work including my client's hard work. But her ability to turn that into something other than just farming the property she had doesn't seem very reasonable to me. But I think if you look at farmers today, the idea that you own a half a million dollars worth of farmland with very little mortgage on it seems to me to point to the fact that these parties were successful in their farming operation, they were able to pay down their mortgage during their marriage and that was something that they did together. The division of property to me seems to be very appropriate, the idea of permanent maintenance given the age of my client, her work history, her ability to find employment elsewhere is appropriate and the amount of maintenance given the income is appropriate. Council cites a couple of cases where someone made a million dollars and someone else made $300,000. I agree, that's what the Nord case and the other case say, but Dr. Nord is paying $17,700 a month and the other gentleman is paying $7,500. The maintenance awards in those cases correspond with the incomes of the parties in those cases. Likewise, this is a smaller amount, $24,000 a year before taxes, which is a reasonable amount and as Judge Pacey found, less than a third of what Mr. Donzie's gross income was. So I think that's appropriate. Mr. Donzie also had things, benefits such as health insurance, retirement accounts, those sorts of things which would never be available to my client. One final word and that is that idea of permanent maintenance, as this Court has noted, permanent maintenance doesn't really mean permanent because if there's a substantial change in circumstance, Mr. Donzie becomes unemployed, Mr. Donzie becomes disabled, something traumatic happens, you do have the right to go back and seek a modification and of course you always have the terminating events, if anything should happen in terms of remarriage, cohabitation or the death of either party. So permanent in this case, well in all cases, doesn't really mean permanent, but in this case seems to be an appropriate amount or appropriate length of time and I don't think there was anything, as I state in my brief, Judge Pacey didn't make any error, let alone reversible error. I think his ruling was very just under the circumstances. Thank you. Rebuttal. In regards to the issue of whether problems have arisen, that certainly isn't before the counsel. Actually, my client has brought issues before and I've said we don't do anything with them until this appeal is done. I think that Judge Pacey was absolutely correct that there will be ongoing problems and there will be. In regard to the issue about how much this property meant to Mrs. Donzie, I don't say anything against that. My client actually spent some of his childhood in this property. It wasn't owned by my client's parents, but they rented it. So he had sentimental attachment also. But I don't think that this is really a place for sin when you get right down to it. This isn't some family base. This is basically a farm, an economic unit. My client was willing to pay for it. He made no secret of that in his proposal. He was willing to pay for it. This wasn't an issue where Judge Pacey divided up the land because nobody was coming forward and saying we're willing to buy out the other party. My client from the beginning was willing to buy out the other party. I think that at that time, Judge Pacey under 503D had to decide what was in the best economic interest of each party. Don't think he did that. I think he decided they both want some of the land, so they each get some of the land. Don't think that that made equitable sense in this particular case. Wouldn't we have to find that Judge Pacey abused his discretion when he assigned the property? Yes. That is clearly the standard, Your Honor. That's what would have to be done. It's a pretty tough standard. A very tough standard, and I understood that from the beginning in regard to the situation. It's a tough standard, but this court occasionally does that too. Sometimes it occurs. This, I think, is an unusual case. At least in most cases where I've been involved in, in regard to divorce, oftentimes the situation where one party with the economic resources just doesn't want to face up to the music and realize it's time to pay out a lot of money. In this case, it's unusual in that my client was willing to do that, and the other party, for whatever reason, was not willing to take that and wanted something different. The judge decided, time to do something different in this case, just divide up the land. Once again, we think under 503D, it just wasn't a just result for either party in this particular case. In regard to the maintenance issue, returning to that, once again, rehabilitative maintenance. Let's say the judge had said, $2,000 a month for two years, and we'll see how she's doing. Because she does have this skill set. Let's see how she's doing in the community farming. If she isn't doing so well, we'll keep it going. If she is doing well and attaining close to the income of Mr. Donzie, we'll stop it at this point. $73,000 isn't bad money in Livingston County. It's not world-beating money. It's not doctor-surgeon type of money. We would submit that as a farmer in Livingston County, it would be possible for her to come close to that. Something that the court might well have taken into consideration. With permanent maintenance, we'll never know. Thank you, Your Honors. Thank you, counsel. We'll take this matter under advisement and stand in recess until we get into the next